IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**JAMES CLARE, JR. and KATHY CLARE**,　　　　　　　Civil No. 1:11-3024-CL

　　　　　Plaintiffs,　　　　　　　　　　　　　　　　　　　**ORDER**

v.

**TIMBER PRODUCTS CO. LIMITED PARTNERSHIP, doing business as Timber Products Company; TP TRUCKING, LLC**,

　　　　　Defendants.

CLARKE, Magistrate Judge:

### INTRODUCTION

In their second amended complaint for bodily injuries, plaintiffs James Clare, Jr., and Kathy Clare allege claims for violation of Oregon's Employer Liability Law; negligence; and loss of consortium against defendant Timber Products Co. Limited Partnership (defendant or Timber Products).[1] The parties have executed written consents for entry of judgment by a magistrate

---

[1] TP Trucking, LLC (TP Trucking), was dismissed as a defendant by stipulation of the parties [#21].

Order - 1

judge (#17). 28 U.S.C. § 636(C); Fed. R. Civ. P. 73. Before the court are motions for summary judgment (#22) filed by defendant Timber Products; plaintiffs' motion for leave to file third amended complaint (#39); and plaintiffs' motion to supplement response (#41). For the reasons explained, defendant's motions for summary judgment are denied; plaintiffs' motion to supplement their response to defendant's motion is denied; and plaintiffs' motion for leave to file amended complaint is granted in part and denied in part.

## BACKGROUND

Timber Products, TP Trucking, and TP Sales Company (TP Sales) are owned by the same owners. Defendant Timber Products owns about six lumber mills, including one in Medford, Oregon. Timber Products mills are treated as a customer by TP Trucking.

Plaintiff James Clare worked for TP Trucking as an owner/operator, and was an independent contractor. TP Trucking and James Clare signed a lease agreement in October 2008 for James Clare to transport freight by motor vehicle. The lease agreement identifies James Clare as "'Contractor'" and provides in pertinent part, "Contractor shall be responsible for count, for oversight of the proper and secure loading and unloading, and for the condition of all cargo." (J. Clare Dep. 112 & Dep. Ex. 4.) TP Trucking Personal Protective Equipment Policy dated August 2005[2] in its "Fall Protection" section provided:

> It is the policy of TP Trucking that Drivers will wear the restraint harness at all Timber Products Company facilities and at all Customer facilities **where it is available.** The harness will be worn and restraint system utilized any time drivers find it necessary to leave the ground to climb on or above the level of their trailer decks for the specific purpose of securing, un-securing, tarping or un-tarping their loads.

---

[2] James Clare was an owner/operator for TP Trucking in August 2005.

Order - 2

(J. Clare Dep. at 113-15 & Dep. Ex. 5 (emphasis added).)[3] James Clare and Kathy Clare each signed a TP Trucking document in October 2008, "Hard Hat, Safety Glasses, & Safety Harnesses," which provided in part, "All drivers MUST wear a safety harness when loading and unloading at all Timber Products locations and any vendors requiring a safety harness to be worn." (J. Clare Dep. 116-17 and Dep. Ex. 6; K Clare Dep. at 52-53 and Dep. Ex. 8.)

TP Sales sent an electronic transportation notification order #868274 to carrier TP Trucking for product from Timber Products in Medford. The notification stated it was for delivery in Cincinnati and was to be "tarped." (Martin Decl. & Ex. 1.) Plaintiffs were at Timber Products lumber yard on May 20, 2010, to pick up the load. James Clare had been to the Medford Timber Products yard to pick up loads "quite a few times"– more than ten to fifteen times a year–over the previous six years and he was familiar with operations there. (J. Clare Dep. at 22.) After weighing in at the scalehouse, James Clare was directed to one of two loading areas by the loader / forklift driver. At the loading dock were signs including a sign stating, "TRUCK LOADING/ UNLOADING SAFETY PROCEDURES," with instructions to drivers, including "The Lift Truck Operator is in charge of the Loading Ya[rd]"; and a sign stating, "OVERHEAD SAFETY HARNESS *MUST BE USED* WHEN TARPING LOADS OVER 10 FEET IN HEIGHT." (Pl. Ex. 9, 11, 12.) After two units were loaded on the trailer, James Clare told the forklift driver to remove them so he could wrap the load in plastic as instructed by dispatch on the Qualcomm. The Qualcomm is an electronic device, or on-board computer, that TP Trucking dispatch uses to send load information to truck drivers. The forklift driver brought

---

[3] The parties disagree whether a fall protection restraint system was "available" to truckers who had loaded product at the loading area.

Order - 3

a new box of plastic and opened it. James and Kathy Clare put the plastic on the flatbed from the ground by rolling it forward, opening it and unfolding it, with about three feet draped over the edge on each side. The second half of the roll of plastic was still rolled at the front of the trailer. James Clare had the forklift drivers load the trailer in a particular way, loading it "off-center." (J. Clare Dep. at 28-30.) James Clare put the remainder of the roll on top of the load and then climbed on top to roll it out. His common practice was to stand on the units and, holding the roll, unroll the plastic while walking backward down the center toward the back of the truck; Kathy Clare, who was on the ground, would pull it down on her side. Although the box of plastic stated it was a 100-foot roll, the plastic was short and needed to be spliced. One of the forklift drivers brought a partial roll. James Clare always got on top of the load to splice the plastic so as to get full coverage of the load. James Clare was on top of the units, standing up, trying to straighten out the plastic to get it overlapped, when he lost his footing and fell to the ground.

Wrapping a load in plastic was commonly done at the loading area. Between 2004 and 2010, when James Clare was working for TP Trucking, he had not seen a single trucker at the Timber Products yard put plastic over a load anywhere except the loading place. One forklift driver knew of two instances during his employment from August 2008 to May 20, 2010, when truckers had gone up to the tarping area to wrap plastic.

Forklift drivers would sometimes "get up and help the truck drivers to get the plastic on." (Niedermeyer Dep. at 16.) The forklift drivers had staple guns. They would also help staple the plastic to the load.

Order - 4

A fall protection structure was located on site at the Timber Products Medford yard at the tarping area located some distance -- 100 to 200 yards -- from the loading area. There was no fall protection structure located at the loading area. James Clare did not use fall protection when he was on top of the load wrapping it in plastic; he did not think to use it on May 20, 2010, when he climbed on top of his load. He had used the fall protection structure at the Timber Products Medford site for tarping before.

After a trailer was loaded with product, it was strapped at the loading area. A forklift driver accompanied the trucker to the scales where the truck was weighed and loading paperwork was completed. A trucker could then tarp the load at the tarping area which had a fall protection structure.

Truckers plastic wrapped their loads at the loading dock as a practical matter. A forklift driver testified:

> [Truckers] routinely wrapped the plastic where we loaded it for convenience. The procedure is that we would load the truck, plastic wrap it, go to the scale, weigh the truck, get the paperwork and then the trucker would tarp the truck.
> It was more convenient for the trucker and for us to be able to help him on the spot instead of breaking up that sequence.

(Jarrell Dep. at 17-18.) Evident in the record is that, after plastic was put on the flatbed and the trailer was loaded, the plastic hung down from the flatbed on each side several feet covering the flatbed railing used to secure and winch the straps; and the remainder of the roll of plastic to be used on top of the load to cover and wrap the load was loose with no place to secure it. This would make strapping the load for movement to the tarping area difficult. At the tarping area, the straps would need to be unstrapped for wrapping the plastic over the top of the load and, after

Order - 5

wrapping the load, the load would need to be strapped again before moving to the scalehouse. The trucker would need to return to the tarping area to tarp the load after weighing.

Timber Products was aware that plastic wrapping was routinely being done at the loading area.

Posted at the Timber Products Medford complex prior to May 20, 2010, with a "Timber Products Company" heading, was the following:

> Apparently we have some confusion on when and what loads require plastic wrap.
> All loads going to the east and Southeastern states require plastic wrap on the trailer deck and over the top of the load. We require the driver to inquire at the shipping department for the plastic and they are instructed to apply the materials himself/herself.
>
> We have had issues with loads being wet on delivery and hope to correct this problem.
> We thank you for your cooperation and apologize for the confusion
>
>                           Management

Below the word "Management" is hand-written "TP Trucking." (Pl. Ex. 14; Niedermeyer Decl. Ex. 2.) There is nothing in the summary judgment record about when, and by whom, this was written. The language of the posting was, according to Timber Products, received in a communication from TP Trucking dated April 10, 2009, after Timber Products superintendent Mike Niedermeyer asked for clarification on use of plastic. (Jan. 26, 2012 Niedermeyer Decl.)

Order - 6

## DISCUSSION

### I. DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

#### A. Standards for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (per curiam). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. Playboy Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party must carry the initial burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). The moving party meets this burden by identifying for the court portions of the record on file which demonstrate the absence of any genuine issue of material fact. Id.; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995). All reasonable inferences are drawn in favor of the non-movant. Gibson v. Cnty. of Washoe, 290 F.3d 1175, 1180 (9th Cir. 2002).

If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts which show there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see

Order - 7

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 & n.4 (1986). Summary judgment should be granted for the movant, if appropriate, in the absence of any significant probative evidence tending to support the opposing party's theory of the case. Fed. R. Civ. P. 56(e); THI-Hawaii, Inc. v. First Commerce Fin. Corp., 627 F.2d 991, 993-94 (9th Cir. 1980); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. Devereaux, 263 F.3d at 1076.

### B. Analysis

#### Defendant's Motion One: Claims Under Employer Liability Law

Oregon's Employer Liability Law (ELL or ELA), ORS 645.305 to 645.636, requires,

> Generally, all owners, contractors or subcontractors and other persons having charge of, or responsibility for, any work involving a risk or danger to the employees or the public shall use every device, care and precaution that is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices.

"The purpose of the ELA is the maximum protection of workmen engaged in hazardous occupations." Wilson v. Portland Gen. Elec. Co., 252 Or. 385, 395 (1968). ELL requirements have been interpreted by the courts in terms of defendant's control over the work resulting in a plaintiff's injury. Id. at 390 (citing Thomas v. Foglio, 225 Or. 540, 546 (1961)). The ELL applies to "indirect employers." Brown v. Boise-Cascade Corp., 150 Or. App. 391, 396 (1997) (citing Miller v. Georgia-Pac. Corp., 294 Or. 750, 754 (1983)).

Order - 8

> ELL liability can be imposed on a person or entity who (1) is engaged with the plaintiff's direct employer in a "common enterprise"; (2) retains the right to control the manner or method in which the risk-producing activity was performed; or (3) actually controls the manner or method in which the risk-producing activity is performed.

Woodbury v. CH2M Hill, Inc., 335 Or. 154, 160 (2003) (footnote omitted) (citing Wilson, 252 Or. at 391-92); Miller v. Georgia-Pac. Corp., 294 Or. 750, 754 (1983).

Defendant argues that the evidence shows none of these tests are met because covering the load with plastic wrap was solely the responsibility of plaintiff James Clare as the flatbed driver and defendant did not assume affirmative duties, direct the method of performance, or control his actions. Plaintiff[4] contends that he was injured by a commingling of activities in the loading operations which defendant had actual and/or retained control over, such that each test is met.

There is no dispute that plaintiff was performing work involving risk or danger to him when he wrapped the load in plastic.

While plaintiff asserts defendant exerted control over the entire loading operations, the dispositive issue here is whether defendant had control over the plastic wrapping of loads.

### Common Enterprise Liability

Where defendant and plaintiff's employer is simultaneously engaged in carrying out work on a common enterprise, defendant may be liable under the ELA. The Oregon Supreme Court has found that:

---

[4] References to plaintiff are references to plaintiff James Clare unless otherwise stated.

Order - 9

> When, as the result of the activities of defendant's employees or use of his equipment, a risk of danger is created which contributes to an injury to plaintiff who is the employee of another engaged in work on the same project, defendant has been considered to have sufficient control over the work to be subject to the duties imposed by the [ELA]. This is so even though he might not have had actual control over the specific activity in which plaintiff was engaged at the time of his injury. . . . We do not construe the ELA to impose a duty upon each employer, engaged in a common enterprise with another, to make safe the equipment and method of work of the other, even though both have a measure of control over the activity in which they are jointly engaged. The injury must result by virtue of the commingling of the activities of the two employers and not be solely attributable to the activities or failures of the injured workmen's employer.

Wilson, 252 Or. at 391-92 (citing Thomas v. Foglio, 225 Or. 540, 546 (1961); Browning v. Terminal Ice & Cold Storage Co., 227 Or. 36 (1961)). To be liable under the common enterprise test, a defendant employer must "'do more than have its own employees working with plaintiff toward the furtherance of a common enterprise.'" Instead, a defendant employer "must exercise 'control or charge over the activity or instrumentality that causes the injury.'" Brown, 150 Or. App. at 396-97 (quoting Sacher v. Bohemia, Inc., 302 Or. 477, 485 (1987)); Moe v. Eugene Zurbrugg Constr. Co., 202 Or. App. 577, 590 (2005). The cases discussing common enterprise liability find that "there must be a causal link between the defendant's involvement in joint work and the plaintiff's injury." Brown, 150 Or. App. at 397.

Defendant Timber Products seems to contend first that there was no joint operation to cover plaintiff's load with plastic because, while the forklift drivers could help truck drivers with stapling the plastic to the load, it was not their job responsibility. See Sacher v. Bohemia, Inc., 302 Or. 477, 486-87 (1987) ("the 'common enterprise' test requires, first, that two employers (the plaintiff's actual employer and a third-party defendant employer) participate in a project of which the defendant employer's operations are an 'integral' or 'component' part."). It seems

clear that defendant's employees, the forklift drivers, and plaintiffs were engaged in the joint work of loading plaintiffs' trailer, including wrapping the load in plastic. See Brown, 150 Or. App. at 397-98 & n.5 (plaintiff and defendant both participants in "'sprucing up'" mill but "no evidence that defendant's employees assisted [plaintiff's employer's] employees, including plaintiff, in their painting activities or that defendant shared any equipment with [plaintiff's employer's] employees, including plaintiff.") (and cases cited); Moe, 202 Or. App. at 590-91.

The issue under the common enterprise theory is the element of whether defendant exercised "'control or charge over the activity or instrumentality that cause[d] the injury.'" Brown, 150 Or. App. at 396 (quoting Sacher, 302 Or. at 486). Defendant argues it did not control the manner of wrapping, the method of wrapping, the location of wrapping, or plaintiff's choice not to use the fall protection structure on site. In support, defendant offers evidence that the lease agreement between plaintiff and TP Trucking provided he was responsible for oversight of the proper and secure loading and the condition of cargo; plaintiff James Clare admitted the driver is responsible to put the plastic on; and it is not part of a forklift driver's job responsibilities to help get plastic on the loads or to staple the plastic to the loads; it was done as a courtesy. However, plaintiffs offer evidence that the forklift drivers provided the plastic; and the two forklift drivers who helped plaintiffs at the loading dock on May 20, 2010, each had a staple gun and it was common or routine for them and other forklift drivers to help truck drivers with the plastic including stapling either from the ground or on the flatbed. One forklift driver agreed that helping to staple was part of his job responsibility. He testified he would get up on the flatbed 90-95% of the time to help unfold the plastic. He also testified that it was after he and plaintiff James Clare had rolled the plastic roll up over the top that they found it was short. If

Order - 11

needed, he would help do the splicing to allow the plastic to cover the load. Plaintiff testified concerning splicing the plastic: "They would help staple it. He would have to unwrap it because it was still on the roll. He would have to roll it out to get the length and open it up in order for it to cover your load." (J. Clare Dep. at 47.)

The Court finds on this record that genuine issues of material fact exist as to whether defendant exercised control or charge over plastic wrapping of loads. Defendant's motion one for summary judgment on this ground is denied. The issue of control is discussed further below.

### Retained or Actual Control Liability

ELL liability may be imposed "in a situation in which the defendant retains a right to control or actually exercises control as to the manner or method in which the risk-producing activity is performed." Miller, 294 Or. at 754 (citing Wilson, 252 Or. at 391-92; Thomas v. Foglio, 225 Or. 540, 545-57 (1961)). Any retained right of control "should bear some relation to the creation of a risk of danger to workmen resulting from dangerous working conditions." Wilson, 252 Or. at 395-96.

Defendant contends it did not have the right to control or actually control the manner or method of wrapping the loads with plastic. It contends plaintiff James Clare, as an independent trucker who had signed a lease agreement with TP Trucking, was the person responsible for deciding whether to utilize fall protection or take other safety measures when picking up a load at Timber Products lumberyard. In support, defendant offers evidence that plaintiffs were directed by TP Trucking dispatch to wrap the load in plastic; after one of the forklift drivers loaded two units on the trailer, plaintiff James Clare told him to remove them so he could wrap the load in

Order - 12

plastic; the forklift driver opened a new box of plastic; plaintiffs James Clare and Kathy Clare put the plastic on the flatbed; after plaintiff was satisfied with the plastic, he had the forklift driver start loading the units; if the forklift driver loaded the units in a fashion not acceptable to plaintiff, he would ask them to change how it was loaded; and plaintiff James Clare testified that it was the driver's responsibility to put plastic on the flatbed. As recounted above, the lease agreement between plaintiff and TP Trucking provided plaintiff was responsible for his load and the condition of the cargo. Defendant also offers evidence that TP Trucking policy required plaintiff to use fall protection at all facilities where it is available; a fall protection structure was available at defendant's yard; and plaintiff admitted he could have used the fall protection on site to plastic wrap his load.

In response, plaintiffs rely on evidence that: defendant controlled the entire loading process as indicated by the signage in its yard, including a sign at the loading dock that the forklift driver is in charge of the loading yard; defendant's employees chose the loading dock where plaintiffs' trailer was to be loaded; and defendant's employees issued the plastic for wrapping loads at the loading dock. Plaintiffs point to evidence that, while he was on top of the load to splice the plastic and was trying to straighten it one of the forklift drivers did not like the way he had the plastic:

> we always hung some [plastic] off. And then I cut that and threw that roll down and I was trying to straighten that piece of plastic in order to – because that piece of plastic on the ground would come up and he wanted it to overhand and it wouldn't overhang. That is how I knew I needed to cut another piece. . . .

(J. Clare Dep. at 35-36.) Plaintiffs also point to a document with a Timber Products Company heading stating that all loads going to the east require plastic wrap on the trailer deck and over

Order - 13